STATE OF OKLAHOMA et al., Plaintiffs,

v.

Patricia R. HARRIS, Secretary of the United States Department of Health, Education and Welfare, et al., Defendants.

Civ. A. No. 78–0475.

United States District Court, District of Columbia.

Oct. 31, 1979.

Charles A. Miller, Washington, D. C., for plaintiffs.

Catherine A. Ribnick, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

In this proceeding thirteen states[1] challenge the constitutionality of Section 1618, the so-called "pass-through" provision of the Supplemental Security Income (SSI) program of the Social Security Act (Act), 42 U.S.C. § 1382g.[2] Named as defendants are the Secretary of the Department of Health, Education and Welfare (Department or HEW) and other officials of that agency. Declaratory and injunctive relief is sought against the HEW officials charged with the administration of the controverted provision and other provisions of the Act related to and affected by the defendants' implementation of Section 1618.

Section 1618 requires the states as a condition of the receipt of federal Medicaid funds to maintain certain levels of state payments to the SSI program. The plaintiffs charge that the Section presents a misuse of the federal spending power, abridges the sovereign rights of the states, and is unconstitutional under the Tenth Amendment of the Constitution.

The parties concede that there are no material facts in dispute and the legal issues presented may be resolved by appropriate cross motions for summary judgment. Such motions have been filed. *Amici* memoranda supporting the HEW have been submitted on behalf of the National Senior Citizens Law Center, the Legal Services Corporation of Alabama, Inc., and the Legal Aid of Western Oklahoma, Inc.

After a consideration of the parties' legal memoranda and supporting points and au-thorities, the Court rejects the challenge of the plaintiff states, enters summary judgment for the defendants and dismisses the complaint. The reasons for this determination are set forth in this Memorandum Opinion.

## SUMMARY OF THE STATUTORY SCHEME

### A. *General Background*

The Social Security Act of 1935[3] represented a response of the Congress and the federal government to the severe economic and social dislocation which affected a large segment of the country's population in the early 1930's. Within the context of this litigation, the original 1935 Act included a federal old age insurance program, grants to states for old age assistance and grants for aid to the blind. Under the grant in aid programs, a state would be reimbursed by the federal government for expenditures made for such aid by adopting and filing a plan for its assistance programs which complied with federal requirements. A state would administer its own program but in order to receive reimbursement for its expenditures, the state was obliged to conform to certain federal requirements.

Since 1935 the Act has been amended frequently to reflect changing problems, emphasis and needs. This proceeding concerns the aspects of the Act which, through federal-state cooperation, provide cash assistance and medical care for the purpose of meeting the related economic and health needs of the poor. Two federal programs providing financial assistance to persons with low incomes are involved: the Supplemental Security Income program and the Medicaid program. Also involved in this litigation is the relation between those programs and state programs of financial assistance which supplement and augment the federal SSI program.

1. The plaintiffs include the States of Alabama, Colorado, Connecticut, Florida, Idaho, Illinois, Louisiana, Michigan, Missouri, Nebraska, Oklahoma, Washington, and the Commonwealth of Virginia.

2. Pub.L.No. 94–585, § 2, 90 Stat. 2901, Oct. 21, 1976, added Section 1618 (42 U.S.C. § 1382g) to the SSI statute, effective June 30, 1977. Section 1618 is referred to as the "pass-through" provision of the SSI program.

3. Social Security Act of 1935, ch. 531, 49 Stat. 620 *et seq.* (1935) (current version at 42 U.S.C. §§ 301 *et seq.* (1976)).

### B. Supplemental Security Income Program

The SSI program, a federally administered welfare program, provides cash assistance payments directly to needy-eligible aged, blind and disabled persons.[4] Enacted in 1974, it replaced a system of federal grants, under the Social Security Act, to states for use with state funds in state administered programs of cash assistance to needy adult persons. With inauguration of the SSI program, the former federal state matching fund program was terminated.

Under the replaced state programs, the assistance payments made to the participants varied from state to state. The SSI program, however, provides the states with uniform, federally-funded minimum payment levels, available to all recipients. The federal government also determines the eligibility of recipients and administers the program.

### C. The Medicaid Program

The Medicaid Act[5] established a program of federal grants to states for the purpose of providing medical assistance to the needy. Assistance is generally provided in the form of reimbursement from the state to providers of medical services, such as physicians, hospitals, nursing homes or other institutions. The federal government in turn reimburses the states for a portion of their Medicaid expenditures.

Prior to 1965, such assistance had been administered as part of the programs of cash assistance to the needy. In 1965 it was made administratively separate from cash assistance programs. See Pub.L. No. 89–97, 79 Stat. 286.

Medicaid is the largest federal-state matching fund program now in existence. Each of the participating plaintiff states has been in the program, since July 1, 1977, when the "pass-through" amendment took effect.

### D. State Supplement Program

Since many state grant programs paid assistance at levels higher than those pro-vided under the SSI program, the Congress recognized that some states might desire to supplement the uniform federal payment. Indeed, a state was encouraged to supplement the basic federal payment with state funds so as to avoid a hardship to needy recipients arising when receiving only the minimum SSI payment. These supplements are from state funds and were at the option of the states.

Section 1616 of the Social Security Act, 42 U.S.C. § 1382e, recognizes and provides for state supplementary payments. These are assistance payments based on need and made by a state in supplementation of the federal SSI benefits. They are paid in cash on a regular basis to individuals who are receiving, or but for the level of their income would receive, SSI benefits. Such payments are not counted as income to reduce an individual's federal SSI payments. As an incentive for the state to furnish supplementary payments, the statute provides that the payments may be administered by the federal government at no cost to the state.

### E. Cost-of-Living Adjustments

Since July 1974 federal SSI benefits have been geared to changes in the cost of living and the benefits have been increased in accordance with changes in the Consumer Price Index. Section 1617 of the Act, 42 U.S.C. § 1382f. Thus, recipients are enabled to purchase basic needs and keep pace with inflation. Cost-of-living increases have been effective since 1974 and the level of federal SSI payments has also been raised. But at the time these federal increases were made to meet inflationary costs, many states decreased their supplemental payments to SSI recipients. As a consequence many individuals did not receive the benefit of the federal cost-of-living increase and ended up receiving no more assistance than before the federal increase. Instead, the federal increase provided fiscal relief to certain states which reduced their expenditure on state supple-

---

4. Subchapter XVI of the Social Security Act, 42 U.S.C. §§ 1381 et seq. (1976).

5. Subchapter XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq. (1976).

mentation. To meet this problem the Congress enacted Section 1618, the statute at issue in this litigation.

### F. *The Controverted Provision*

Section 1618 of the SSI program requires as a condition of eligibility to receive federal grants for Medicaid, that a state maintain payments made in supplementation of SSI payments at a level no lower than that in effect in December 1976, or the first subsequent month in which supplementary payments were made. A state is in compliance if it spends a total amount of money on supplementation payments for any 12-month period which is not less than its expenditures for the preceding 12-month period.

The purpose of this added Section was to ensure that the cost-of-living adjustments in federal SSI payments would be "passed through" in their entirety to SSI recipients. The plaintiffs assert that the provision prevents a state for any reason from ever reducing the level of supplementary payments from its own funds below their December 31, 1976 level, except by rendering itself ineligible for federal Medicaid funds. They contend that this imposed condition is impermissible because it is totally unrelated to the Medicaid program.

### LEGAL ANALYSIS

Two grounds are asserted as the basis for the challenge to the provision: it is irrational and beyond the constitutional authority of the federal government; it is violative of the Tenth Amendment and the governing principles of federalism.

### A.

Article I, Section 8, Clause 1, the tax and spend clause of the Constitution, confers upon the Congress extremely broad authority:

> The Congress shall have Power To lay and collect Taxes . . . and provide for the common Defence and general Welfare of the United States . . ..

The proposition that Congress, in the exercise of its spending power and expenditure of funds for the general welfare, may impose reasonable conditions on the benefits it grants has been recognized generally with reference to legislation concerned with social and economic problems. Thus, an early challenge before the Supreme Court that the old age benefits provision of the Social Security Act impermissibly intruded on the powers of a state, was denied by the Supreme Court. *Helvering v. Davis*, 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307 (1936). In approving a provision of the Act and rejecting the claim that it infringed on powers reserved to the states the Court held that "unless the choice is clearly wrong, a display of arbitrary power, [and] not an exercise of judgment," it would not overturn a determination of the Congress as to what will promote the general welfare. *Id.* at 640, 57 S.Ct. at 908. Recognizing that the Congress exercised wide discretion in determining what constitutes the general welfare, the Court cited *United States v. Butler*, 297 U.S. 1, 67, 56 S.Ct. 312, 80 L.Ed. 477 (1935) and noted:

> When such a contention comes here we naturally require a showing that by no reasonable possibility can the challenged legislation fall within the wide range of discretion permitted to the Congress.

*Helvering v. Davis*, 301 U.S. at 641, 57 S.Ct. at 908.

In *Steward Machine Co. v. Davis*, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1936), a companion proceeding to *Helvering*, a further aspect of the federal social security program offering conditional grants to the states was upheld. There the Supreme Court approved a federal statute conditioning tax credits for private employees upon enactment by the state of a federally approved unemployment compensation law. Its challengers had argued that it exceeded the powers of Congress and was coercive toward the states.

Clear authority for initiating and developing federal programs and for providing grants to state governments upon certain conditions is seen in various contexts. In *Oklahoma v. United States Civil Service Commission*, 330 U.S. 127, 67 S.Ct. 544, 91

L.Ed. 794 (1947), provisions of the Hatch Act were upheld which imposed sanctions upon states for failure of their employees engaged in activities partially funded by the federal government to comply with the Act. The Civil Service Commission had found that certain activities of an Oklahoma official violated the Hatch Act and required removal of the employee or loss of related federal funds. As to this the Court concluded that, "[w]hile the United States is not concerned with, and has no power to regulate, local political activities as such of state officials, it does have power to fix the terms upon which its money allotments to states shall be disbursed." *Id.* at 143, 67 S.Ct. at 553. And further, in affirming the Commission's authority to require removal of the employee or to withdraw federal assistance, the Court found that "[t]he offer of benefits to a state by the United States dependent upon cooperation by the state with federal plans, assumedly for the general welfare, is not unusual," and is well within the bounds of the Constitution. *Id.* at 144, 67 S.Ct. at 554.

Recently, in *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974), conditions imposed upon grant of federal assistance under the Civil Rights Act of 1964 were examined. The claim was made in a suit brought by non-English-speaking Chinese students that school officials failed to provide English language training and thereby deprived them of equal educational opportunities. The Act excluded from participation in federal financial assistance those recipients who discriminate against national origin groups. The Court upheld the financial sanctions imposed under the Act as within the broad power of the government over the use of federal funds and concluded that "[t]he federal government has power to fix the terms on which its money allotments to the States shall be disbursed. . . Whatever may be the limits of that power . . . they have not been reached here." *Id.* at 569, 94 S.Ct. at 789 (citations omitted).

In sustaining the broad federal authority to tax and spend, the rationale has been that it need only be applied in a reasonable

manner and for the general welfare. The campaign funding provisions of the 1971 Federal Election Campaign Act were upheld as within the power of Congress, deferring to the legislature the determination of what actions serve to promote the general welfare. The general welfare clause was found to be a

grant of power, the scope of which is quite expansive, particularly in view of the enlargement of power by the Necessary and Proper Clause. . . . It is for Congress to declare which expenditures will promote the general welfare . . . .. Whether the chosen means appear "bad," "unwise," or "unworkable" to us is irrelevant; Congress has concluded that the means are "necessary and proper" to promote the general welfare, and we thus decline to find this legislation without the grant of power in Art. I, § 8.

*Buckley v. Valeo*, 424 U.S. 1, 90–91, 96 S.Ct. 612, 668–669, 46 L.Ed.2d 659 (1976).

In *Massachusetts v. United States*, 435 U.S. 444, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978) a federal "flat fee" tax imposed on all civil aircraft including those owned by the states was upheld. The tax was part of a comprehensive program to recoup the costs of federal aviation programs, and it was held to fall within the broad authority of Congress to tax and spend even when the burden of such tax was borne partially by the states. The Court affirmed this exercise of Congressional power and noted, "[w]e have repeatedly held that the Federal Government may impose appropriate conditions on the use of federal property or privileges and may require that state instrumentalities comply with conditions that are reasonably related to the federal interest in particular national projects or programs." *Id.* at 461, 98 S.Ct. at 1164.

Several recent circuit court opinions merit attention and lend further support. *Florida v. Mathews*, 526 F.2d 319 (5th Cir. 1976) and *Arizona State Department of Welfare v. HEW*, 449 F.2d 456 (9th Cir. 1971). Each involved problems arising under the Social Security Act.

*Florida* involved a regulation requiring termination of assistance under the Medicaid program for failure to comply with federal guidelines governing the composition of state nursing home licensing boards. Florida elected to participate in the Medicaid program and the optional nursing home provisions, but sued to enjoin enforcement of the regulations since its licensing boards did not meet the regulatory standards. In denying relief the court noted that as long as the regulations reasonably furthered the purpose of the enabling legislation, the sanctions were a valid exercise of Congressional power.

*Arizona State Department of Welfare* concerned federal welfare assistance funding and required that standards applied by the states for eligibility conform with certain federal regulations particularly with respect to income qualifications and residency requirements. The agency interpretation of the regulations was accepted on the theory that statutory construction by those charged with its execution should be followed unless there are compelling indications to the contrary. The court ruled that the regulation requiring termination of federal funds for public assistance programs which failed to conform to the federal standards was necessary and reasonable and that since there was no strong showing to the contrary, the court would not question its validity.

This line of cases illustrates judicial deference to Congress in this area even when sanctions and taxes are applied to the states. So long as the statute is reasonably related to the general welfare and is enacted in furtherance of the Congressional power to tax and to spend under the Constitution, the courts will sustain and uphold its validity.

The plaintiffs contend that the relation between the Medicaid program and the "pass-through" conditions that qualify a state's right to receive Medicaid funds is insubstantial, at best. They also assert that the legislative history of Section 1618 does not reflect any relationship or purpose between the statute and the Medicaid program.

In advancing those arguments, however, the plaintiffs minimize and overlook the fact that the defendants have pointed out and shown convincingly that medical assistance and cash forms of assistance to the needy aged, blind, and disabled are interdependent aspects of the Social Security Act which has developed into a comprehensive program of social security.[6] This interdependency has long been recognized and the Congress has consistently treated the two problems together and as one to be resolved by joint federal-state efforts.

The Court is unaware of any persuasive authority where a Congressional enactment has been rejected on grounds that the Congress has acted in excess of its authority to spend funds for the general welfare. The requirement generally articulated is that the statute be reasonably related to the general welfare.

The condition placed on federal Medicaid funds by the Section is closely and reasonably related to a legitimate federal purpose for which those funds are provided. Under the circumstances of this case, given the history and development of the Social Security Act and the declared public policy upon which it is predicated, it is doubtful that a serious argument could be mustered that the statutes involved are not in furtherance of the general welfare and an appropriate exercise of the Congressional power in that regard.[7]

### B.

The Tenth Amendment challenge is that the provisions impermissibly intrude upon the reserved powers and sovereign authority of the states under the Tenth Amendment. That Amendment provides:

---

6. Defendants' Memorandum in Support of Cross Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment at 13–20.

7. *Id.* at 4–9 and 13–16.

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

The plaintiffs contend that the "pass-through" condition invades the prerogatives of the states by requiring them to maintain the level of their present expenditure from state funds for supplementary payments at the risk of losing federal Medicaid funds. They argue that the requirement denies state governments an opportunity to exercise alternatives or any choice as to how state-derived revenues will be spent except at the risk of losing Medicaid funds and thus severely restricts state policy making authority and a state's control of its own treasury. In short, the threatened loss of federal funds coerces the states into accepting conditions that infringe on their sovereignty.

To support the Tenth Amendment claim the states rely in great part on *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), where the Supreme Court invalidated 1974 amendments to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq., as amended by* Act of Apr. 8, 1974, Pub.L. No. 93–259, 88 Stat. 55, which extended federal minimum wage and maximum hour provisions to a number of state and city employees. The Court concluded that the Congress had acted beyond the limits of the Commerce Clause of the Constitution and had impermissibly intruded upon "the States' freedom to structure integral operations in areas of traditional governmental functions." 426 U.S. at 852, 96 S.Ct. at 2474.

The Supreme Court noted and stressed that a state must be permitted to make its own decision on how to allocate its revenues and how to provide traditional governmental services to its citizens. In writing for the majority, Justice Rehnquist perceived that the questioned provisions of the Fair Labor Standards Act would intrude upon the orderly provision of those services, cause a relinquishment of important government activities, and interfere with traditional aspects of state sovereignty. 426 U.S. at 847–849, 96 S.Ct. at 2465.

It should be noted, however, that in *National League of Cities,* the state or municipality faced a mandatory directive based on the commerce power of the Congress. In this proceeding the state is not confronted with a Congressional mandate but rather the state is faced with a Congressional inducement which it may accept or reject. Section 1618 does not require or mandate compliance with the "pass-through" provision. The state is free to make its own decision as to the way its financial resources are allocated. It may avoid the requirements of the Section by choosing to withdraw from the Medicaid program.

Such an analysis and conclusion is reflected in *State of North Carolina v. Califano,* 445 F.Supp. 532 (E.D.N.C.1977), *aff'd mem.,* 435 U.S. 962, 98 S.Ct. 1597, 55 L.Ed.2d 54 (1978), where a three-judge court upheld a requirement that in order to receive federal funds for health programs, a state must establish a health planning agency to administer the program. North Carolina argued that to comply would require an amendment to the state's constitution and that the federal requirement was a coercive attempt, forcing it to do so. The court, however, ruled that the requirement was a lawful condition for the receipt of federal assistance and dismissed the North Carolina argument:

It must be remembered that this Act is not compulsory on the State. Unlike the legislation faulted in *State of Maryland v. Environmental Protection Agency* [530 F.2d 215] . . . it does not impose a mandatory requirement to enact legislation on the State; it gives to the states an *option* to enact such legislation and, in order to induce that enactment, offers financial assistance.

*Id.* at 535–536 (emphasis in text) (footnote omitted).

The Tenth Amendment has been consistently construed so as to support the grant and use of federal funds conditioned upon a state's compliance with federal requirements, as long as the state may also choose not to comply. *See Steward Machine Co. v.*

*Davis,* 301 U.S. 548, 585–593, 57 S.Ct. 883, 81 L.Ed. 1279 (1hich extended federal minimum wage an937). Several recent cases from our Circuit and District Court are in accord with this reasoning. In *Texas Landowner's Rights Association v. Harris,* 453 F.Supp. 1025 (D.D.C.1978), *aff'd* 194 U.S. App.D.C. 392, 598 F.2d 311 (D.C.Cir. 1979), the National Flood Insurance Program was upheld against the claim that local communities would lose more by not accepting the program than they would gain by complying with its conditions. *See also County of Los Angeles, California v. Adams,* 187 U.S.App.D.C. 396, 574 F.2d 607 (D.C.Cir.1978); *County of Los Angeles, California v. Marshall,* 442 F.Supp. 1186 (D.D. C.1977), *appeal pending.*

Because compliance with Section 1618 is at the option of a state it does not amount to federal coercion. In no event is there an intrusion upon any functions traditionally reserved for states. But rather, it is an exercise of Congressional power which the courts have consistently recognized and approved. The Tenth Amendment challenge must be rejected.

A subsidiary question has been raised regarding the scope and the administrative interpretation of the "pass-through" statute. The Department has interpreted the Section as applicable to all supplementary payments including those made to persons who do not receive SSI payments at a particular time. Plaintiffs on the other hand contend that Section 1618 should not be read as applying to SSI beneficiaries whose income is at a level sufficient to preclude receipt of a federal payment.

The Department initiated rulemaking proceedings in the early part of this year. 44 Fed.Reg. 18238 (March 27, 1979). These proceedings are expected to be concluded in late 1979. While the proposed rule virtually tracks Section 1618, in view of the likelihood of a final determination in the very near future, the Court defers to that eventuality. Also, absent a final rule, a legitimate question is raised as to whether the matter of statutory interpretation is ripe for judicial review.